# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MAUREEN LOUISE RIOPELLE,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-009

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Maureen Louise Riopelle brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying her application for disability insurance benefits ("DIB"). This matter is before the

Court on plaintiff's statement of errors (Doc. 6), the Commissioner's response in opposition

(Doc. 11), and plaintiff's reply (Doc. 12).

## I.  Procedural Background

Plaintiff protectively filed her application for DIB on December 19, 2013, alleging

disability since July 3, 2009, due to "spinal cord injury stroke," spinal cord concussion and

contusion, radiculopathies, neuropathies, cervical and lumbar disc issues and disc degeneration,

retrolisthesis in cervical spine, muscle spasms and myelopathy, small fiber neuropathy, sciatica,

diffuse body pain, and depression. (Tr. 230). The application was denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before

administrative law judge ("ALJ") Thuy-Anh T. Nguyen. Plaintiff and a vocational expert

("VE") appeared and testified at the ALJ hearing on March 24, 2016. On June 30, 2016, the

ALJ issued a decision denying plaintiff's DIB application. (Tr. 34-55). This decision became

the final decision of the Commissioner when the Appeals Council denied review on November 7,

2017. (Tr. 1-6).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541,

548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B.    The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security Act on December 31, 2013.
>
> 2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of July 3, 2009 through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the [plaintiff] had the following severe impairments: disorders of the spine, disorder of the right hip, and peripheral/small fiber neuropathy (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps and stairs but never ladders, ropes or scaffolds. The [plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to humidity, wetness, extreme cold, and unprotected heights or heavy machinery. The [plaintiff] would be off task five percent of the workday with low stress jobs defined as having occasional changes in the work

setting and occasional decision-making. A sit/stand option at will is defined as sit for 30-minute period of change of position.[1]

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The [plaintiff] was born [in] . . . 1961 and was 52 years old, which is defined as a younger individual age 18-49, on the date last insured. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from July 3, 2009, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

---

[1] This paragraph of the ALJ's written decision appears to contain some typographical errors.

[2] Plaintiff's past relevant work was as a consultant and an editor, both sedentary positions, and as a senior acquisitions employee and sales service promoter, which were light level positions. (Tr. 46). The jobs had Specific Vocational Preparation (SVP) ratings under the Dictionary of Occupational Titles (DOT), Appendix C, of "8" ("over 4 years up to and including 10 years" of vocational preparation required); "6" ("over 1 year up to and including 2 years" of vocational preparation required); and "7" ("over 2 years up to and including 4 years" of vocational preparation required). (*Id.*; *see* https://occupationalinfo.org/appendxc_1.html#II).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled, light jobs such as office helper, with 30,500 jobs nationally; routing clerk, with 45,000 jobs nationally; and weight recorder, with 25,000 jobs nationally. (Tr. 47).

(Tr. 39-47).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a two-fold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### E.   Specific Errors

On appeal, plaintiff argues that the ALJ erred by: (1) failing to evaluate material evidence and making inconsistent findings; (2) improperly weighing the medical and other opinion evidence; (3) improperly evaluating her credibility; and (4) posing a hypothetical to the VE that was not supported by the medical evidence.   (Docs. 6, 12).

### 1.   The ALJ's evaluation of the evidence

Plaintiff's first assignment of error incorporates an amalgam of errors that the ALJ allegedly committed.   Plaintiff's argument is difficult to follow.   Plaintiff alleges that the ALJ erred by failing to account for the fact that her symptoms "wax and wane."   (Doc. 6 at 5).   She asserts that the ALJ cited to some medical examinations "when the pain was less."   (*Id.*).   She contends that "[e]ven in these periods, it was difficult for [her] to 'sustain' unskilled light work for 40 hours a week," which requires the ability to stand/walk for six hours a day and lift 10 to 20 pounds.   (*Id.*, citing 20 C.F.R. § 404.1567(b); Social Security Ruling (SSR) 83-10, 1983 WL 31251 (1983); SSR 83-12, 1983 WL 31253 (1983)).   Plaintiff then addresses what she characterizes as three "material errors, omissions and inconsistencies" in the ALJ's decision. (*Id.* at 5-8).   These are: (1) the ALJ's failure to consider and afford "controlling" weight or the most weight to the one-sentence opinion of examining neurologist Dr. Catherine Willner, M.D., in her October 2011 report that small fiber neuropathy "would 'easily explain'" plaintiff's complaints of pain in her lower extremities (Tr. 803, 1929-31); (2) the ALJ's failure to find

fibromyalgia was one of plaintiff's "severe impairments" and to consider evidence that shows

plaintiff's symptoms waxed and waned; and (3) the ALJ's failure to find that plaintiff suffered

from a complex pain syndrome and pain disorder and to consider how the impairment impacted

plaintiff's ability to stand/walk for six hours each day.   (Tr. 352, 469, 1621, 1931).

### i.     Severe impairment finding

Plaintiff argues that the ALJ erred by failing to find fibromyalgia was a "severe

impairment" in her case and to incorporate limitations imposed by fibromyalgia into the RFC

finding, including limitations on plaintiff's ability to perform the standing/walking requirements

of light work.   (Doc. 6 at 7).   As best the Court is able to discern, plaintiff further argues that

the ALJ erred by failing to find that "complex pain syndrome" or "pain disorder" was a "severe"

impairment in combination with fibromyalgia; to evaluate how these combined impairments

impacted plaintiff's ability to perform the standing/walking requirements of light work, and to

evaluate what her "baseline" condition was without consideration of periods of improvement.

(*Id*. at 7-8).

The Commissioner argues that the ALJ did not deny that plaintiff had been diagnosed

with fibromyalgia; however, the criteria that must be met before fibromyalgia is found to be a

"medically determinable impairment" in a particular claimant's case are not satisfied here.

(Doc. 11 at 7-9, citing SSR 12-2p).   The Commissioner argues that in any event, the ALJ

properly considered all of plaintiff's impairments in formulating her RFC and the ALJ's decision

is supported by substantial evidence.   The Commissioner contends that plaintiff simply

disagrees with how the ALJ weighed the evidence, which is not enough to overturn the ALJ's decision.

Social Security Ruling 12-2p provides guidance on how the agency develops evidence to establish that a claimant has a "medically determinable impairment" ("MDI") of fibromyalgia ("FM") and how the agency evaluates fibromyalgia in disability claims. SSR 12-2p, 2012 WL 3104869 (July 25, 2012).[4] Under SSR 12-2p, the agency will find that a person has a medically determinable impairment of fibromyalgia if a physician has diagnosed fibromyalgia and provided the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record. *Id.* at *2. Under § II.A, the agency "may find that a person has an MDI of FM if he or she has all three of the following:

1. A history of widespread pain - that is, pain in all quadrants of the body . . . and axial skeletal pain . . . that has persisted (or that persisted) for at least 3 months . . . [and which] may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination . . . [which] must be found bilaterally . . . and both above and below the waist [in specified locations using a specific testing method]. . . .

3. Evidence that other disorders that could cause the symptoms or signs were excluded. . . ."

---

[4] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n. 1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)). The Sixth Circuit has refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations but has assumed that they are. *Id.* (citing *Wilson*, 378 F.3d at 549).

*Id.*, at \*2-3.  A person may be found to have an MDI of FM under § II.B. if there is evidence of all three of the following criteria:

1.  A history of widespread pain (see section II.A.1);

2.  Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3.  Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded[.]

*Id.* at \*3.

A "medically determinable impairment" is considered "severe" unless "the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities."  SSR 85-28, 1985 WL 56856, at \*3 (1985).  The claimant's burden of establishing a "severe" impairment during the second step of the disability determination process is a "*de minimis* hurdle."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Id.*

The ALJ found at step two of the sequential evaluation process that plaintiff had the following "severe" physical impairments: disorders of the spine, disorder of the right hip, and peripheral/small fiber neuropathy.  (Tr. 39).  The ALJ did not include fibromyalgia as a "severe" impairment.  Plaintiff alleges that the ALJ's finding is erroneous because "multiple tender points" of the cervical spine were found on examination in January 2010 and plaintiff

9

was diagnosed with "chronic complex pain syndrome" at that time (Doc. 6 at 7, citing Tr. 698-99); treating physician Dr. Jacqueline Ward, M.D., diagnosed plaintiff with myelopathy in January 2011 and reported it had "likely triggered fibromyalgia-like myofascial pain syndrome" (Tr. 1511), she reported that "[d]iffuse trigger point tenderness" was present in February 2011 (Tr. 1502), she reported the myelopathy diagnosis in April 2011 (Tr. 1477), and she reported multiple trigger points in her 2015 assessment (Tr. 968-69); and plaintiff "was exercising regularly for this" in 2015 (Tr. 1419). (Doc. 6 at 7).

The evidence plaintiff relies on does not substantiate that a treating or examining medical provider diagnosed her with fibromyalgia. Dr. Ward checked "[f]ibromyalgia tender points" and "[m]yofascial trigger points" on a check-box list of symptoms in her November 2015 "Arthritis Medical Source Statement," but there is no indication in the statement that Dr. Ward diagnosed plaintiff with fibromyalgia. (Tr. 968-71). Further, Dr. Ward did not indicate that she had performed any tender point testing and, specifically, testing that satisfied the requirements of SSR 12-2p, § II.A.2. Plaintiff also cites the January 2010 treatment notes of Dr. Leon Margolin, M.D., Ph.D., who saw plaintiff at the Wexner Medical Center in in 2010 and 2011 and prescribed trigger point injections. (Tr. 414-94, 1615-26, 698-701). Dr. Margolin expressly concluded in his January 2010 notes (Tr. 698-701) that the trigger point requirements of § II.A.2 were *not* satisfied.[5]

---

[5] Dr. Margolin assessed plaintiff with a "chronic complex pain syndrome secondary to more than 1 pain generator," which were: (1) myofascial pain by history and based on exam findings of "multiple trigger points in the upper spine and bilateral trapezii"; (2) bilateral occipital neuralgia; (3) "Fibromyalgia-like syndrome," noting that she "may have several tender points" in addition to "the trigger points," but he "was not impressed of 11 positive tender points out of 18"; (4) degenerative disc disease of the lumbar spine "over the possible radicular component"; (5) right-side sacroiliitis; (6) bilateral cluneal neuralgia; (7) bicipital tendonitis of the left shoulder and left acromioclavicular joint pain; and (8) muscle spasm. (Tr. 699-701). Dr. Margolin opined that plaintiff could benefit from a number of

However, there is other medical evidence in the record that substantiates a fibromyalgia diagnosis. Specifically, treating physician Dr. Margolin made a fibromyalgia diagnosis in March 2011. (Tr. 414-16). Thus, the question is whether the medical evidence establishes that the criteria of SSR 12-2p, 2012 WL 3104869 are satisfied and supports Dr. Margolin's fibromyalgia diagnosis. The ALJ did not address this issue in her written decision. This was error. There is no dispute that plaintiff was diagnosed with fibromyalgia, and the record is replete with evidence of symptoms that appear to satisfy the requirements of § II.B of SSR 12-2p, 2012 WL 3104869. The treating physicians' reports and assessments document plaintiff's pain and symptoms which included myofascial trigger points, fibromyalgia tender points, tenderness, muscle weakness, muscle atrophy, impaired sleep, and chronic fatigue. (Tr. 417, 419, 968, 974-75). Her physicians also reported that plaintiff suffered psychological symptoms associated with her physical impairments which included depression and anxiety. (Tr. 969, 976). The ALJ erred by failing to find fibromyalgia was a "medically determinable impairment" that had more than a minimal impact on plaintiff's ability to perform work-related functions without evaluating this evidence related to the impairment. On remand, the ALJ should reevaluate the medical evidence and determine whether the criteria for establishing that fibromyalgia is a "medically determinable impairment" that impacts plaintiff's functionality are satisfied.

Further, the records plaintiff cites show that she was variously diagnosed with "chronic complex pain syndrome secondary to more than 1 pain generator" in October 2010 (Tr. 1623)

---

treatments including Lyrica, which could "address her neuropathic pain in the low back as well as possible fibromyalgia-type syndrome," nerve blocks, and epidural steroid injections. (Tr. 700-01).

and "[c]hronic pain, small fiber neuropathy" (Tr. 352, 1931) and "chronic complex pain

syndrome secondary to more than one pain generator" in October 2011 (Tr. 469).  The Sixth

Circuit has discussed the nature and debilitating impacts of a chronic pain disorder:

> "The essential feature of Pain Disorder is pain that is the predominant focus of the
> clinical presentation and is of sufficient severity to warrant clinical attention."
> *DSM [Diagnostic Statistical Manual]-IV-TR*™ at 498.  Pain causes "significant
> distress or impairment in social, occupational, or other important areas of
> functioning" and "[p]sychological factors are judged to play a significant role in
> the onset, severity, exacerbation, or maintenance of the pain."  *Id.*  Pain can
> lead to inactivity and social isolation, which in turn leads to depression, fatigue,
> lack of physical endurance, and more pain.  *Id.* at 500.  [The plaintiff's]
> testimony at the hearing echoed this clinical description of the disorder.
> Individuals who have chronic pain disorder "are sometimes convinced that there
> is a health professional somewhere who has the 'cure' for the pain," and they may
> "spend a considerable amount of time and money seeking an unattainable goal."
> *Id.*

*Minor v. Comm'r of Soc. Sec.*, 513 F. Appx. 417, 435 (6th Cir. 2013).

As discussed *supra*, there is extensive medical evidence of treatment related to plaintiff's

pain and associated symptoms which included myofascial trigger points, fibromyalgia tender

points, tenderness, muscle weakness, muscle atrophy, chronic fatigue, and psychological

symptoms.  (Tr. 417, 419, 968-69, 974, 976).  Plaintiff's symptoms appear to be consistent

with a diagnosis of chronic pain disorder.  Thus, the ALJ erred by failing to consider whether

plaintiff's chronic pain condition was a severe impairment which, either alone or in combination

with her other impairments, imposed functional limitations in addition to those which the ALJ

included in the RFC.  On remand, the ALJ should consider whether chronic pain disorder is a

"severe" impairment and what, if any, additional limitations it imposes on plaintiff's functioning.

### *ii.* *Evaluation of Dr. Willner's statement*

Plaintiff contends that the ALJ erred by failing to give "controlling" weight or the "most" weight under 20 C.F.R. § 404.1527(c) to a one-sentence "opinion" from examining physician Dr. Willner's October 2011 records. (Doc. 6 at 6). Dr. Willner stated: "The patient has objective evidence on examination and limited autonomic testing for presence of small fiber neuropathy which would easily explain lower extremity pain complaints and the objective vascular changes noted on examination." (Doc. 6 at 5-6, citing Tr. 803, 1929-31). Plaintiff alleges that Dr. Willner's finding is supported by the results of an "axial test" performed in January 2010, which disclosed small fiber neuropathy (Tr. 410); Dr. F. Clifford Valentin, M.D.'s finding of "trace" reflexes at the patella and ankle and diagnosis of radicular neuropathic pain in November 2013 (Tr 831-33); and plaintiff's extensive treatment history. Plaintiff contends it was improper for the ALJ to ignore this evidence and to isolate other parts of the medical records to support her decision to deny benefits. (Doc. 6 at 6, citing *Howard v. Comm'r*, 276 F.3d 235, 240 (6th Cir. 2002)). Plaintiff alleges that Dr. Willner's statement is material because the pain in her legs would prevent her from standing/walking for six hours each day, limit her to sedentary work, and mandate a finding that she was disabled at age 50 in 2011. (*Id.*).

Plaintiff's argument that the ALJ erred by failing to give "controlling" or the "most" weight to Dr. Willner's statement is misplaced. Dr. Willner is not a treating physician, and even if she were, "application of the 'treating physician rule' is contingent upon a treating physician actually giving a medical opinion." *Rivera ex rel. H.R. v. Comm'r of Social Sec.*, No. 3:11-cv-163, 2012 WL 3562023, at * 4 (S.D. Ohio Aug. 17, 2012) (Report and

Recommendation), *adopted,* 2012 WL 3871944 (S.D. Ohio Sept. 6, 2012). "Medical opinion[s]" for purposes of 20 C.F.R. § 404.1527 are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s) . . . and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a). "[T]he law and the Social Security regulations recognize a difference between a treating physician's treatment notes or comments, and a treating physician's 'medical opinion.'" *Rivera ex rel. H.R.,* 2012 WL 3562023, at * 4 (citing 20 C.F.R. § 404.1527(a)(2); *Bass v. McMahon,* 499 F.3d 506, 510 (6th Cir. 2007) (a physician's observations are not "medical opinions" under the Social Security regulations, and "without more, are not the type of information from a treating physician which will be provided great weight under 20 C.F.R. § 404.1513(b)"); *Bowen,* 478 F.3d at 749 (noting that a treating physician's general findings are relevant, but not controlling without an RFC assessment). Dr. Willner's "opinion" concerning plaintiff's leg pain is not a "medical opinion" about the nature and severity of plaintiff's impairment and her physical restrictions that the ALJ was required to evaluate under 20 C.F.R. § 404.1527. Thus, the ALJ did not err by failing to evaluate Dr. Willner's statement in accordance with the regulatory factors.[6]

### iii. *Alternative disability onset date*

Plaintiff also argues in connection with her first assignment of error that while she may have shown improvement in her symptoms by 2011, medical records and medical source

---

[6] Plaintiff makes additional arguments to show that the ALJ erred in weighing Dr. Willner's statement concerning the cause of plaintiff's leg pain which pertain to plaintiff's second and third assignments of error. The Court therefore will not consider the arguments in connection with plaintiff's first assignment of error.

statements dated on and after September 2013 show that her condition deteriorated and that she was disabled as of the fall of 2013. Plaintiff alleges:

> If [plaintiff] was better in 2011, as the ALJ claimed, this did not last, shown by Dr. Valentin's records in September and November, 2013 (Tr. 943, 831-33) and into 2014 and 2015 (Tr. 885-887 and forms at Tr. 962-980). In the alternative, the ALJ could then have found [plaintiff] disabled with an onset date of September or November 2013.

(Doc. 6 at 8).

Plaintiff has not factually supported her claim that even if her condition initially improved following the alleged onset date of July 2009, her symptoms thereafter worsened and became debilitating in 2013. The medical evidence plaintiff cites consists of an admitting order for an MRI dated April 2011 (Tr. 943); a treatment record of a follow-up visit with Dr. Valentin dated November 14, 2013, which reports that plaintiff was experiencing continued symptoms but was "[o]verall improving" (Tr. 831-33); Dr. Ward's March 2014 treatment notes which report that plaintiff's chronic neck/back pain was worse (Tr. 885-87); and medical source statements completed in 2015 (Tr. 962-80) which place the earliest probable onset date in July of 2009. (*See* Tr. 965, 971, 979). Plaintiff has not explained how these medical records support an alternative onset date of September or November 2013, and neither is this clear from the record.

### v. *Conclusion*

The ALJ erred at step two of the sequential evaluation process. The ALJ did not evaluate the medical evidence in her written decision and determine whether fibromyalgia was established to be a "severe" medically determinable impairment in this case. Nor did the ALJ find that plaintiff's chronic pain disorder was a "severe" impairment that impacted her functioning, despite the substantial medical evidence documenting that plaintiff suffered from a

chronic pain disorder and debilitating pain and other symptoms. The ALJ's step two finding is not substantially supported. Plaintiff's first assignment of error should be sustained insofar as she challenges the ALJ's step two finding.

## 2. Weight to the medical opinions

Plaintiff alleges as her second assignment of error that the ALJ erred in evaluating the opinion evidence of her treating doctors and the assessment of her physical therapist, Kristin Thomas. (Doc. 6 at 8-11). Plaintiff notes that Drs. Ward and Valentin treated her prior to December 31, 2013, her date last insured, and they relate their opinions back to the alleged onset date of July 2009. Plaintiff argues that the ALJ erred by failing to weigh the factors that must be considered when evaluating a treating physician's opinion and did not give "good reasons" for the weight afforded the treating physicians' assessments. Plaintiff contends that the ALJ erred by failing to properly evaluate the assessment of Ms. Thomas, a third-party source, which is consistent with the opinions of Drs. Ward and Valentin. Plaintiff also argues that it was error for the ALJ to give greater weight to the assessments of the state agency reviewing physicians, who did not have the 2015 medical source statements of plaintiff's treating physicians and physical therapist before them for their review.

### i. *Treating physician standard*

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are

16

"the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242.

A treating source's medical opinion must be given "controlling weight" if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2)[7]; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Gayheart*, 710 F.3d at 376. *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c) (quoting SSR 96-2p, 1996 WL 374188, at *4)[8]. In addition, the ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's]

---

[7] The regulation was in effect until March 27, 2017, and therefore applies to plaintiff's claim filed in 2013. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

[8] SSR 96-2p was rescinded effective March 27, 2017, when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880. Since plaintiff's claim was filed in 2013, SSR 96-2p applies to this case. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 n.9 (6th Cir. 2018).

treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). The ALJ's reasons must be supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376 (citing SSR 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of her case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

"A failure to follow the procedural requirement 'of identifying the reasons for discounting the [treating physician's] opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243). *See also Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545) (remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and the ALJ's opinion does not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.).

Opinions from non-treating and non-examining sources are never assessed for "controlling" weight. A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376. Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

Under the regulations and rulings applicable to plaintiff's claim, only "acceptable medical sources" as defined under former 20 C.F.R. § 404.1513(a)[9] can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *See* SSR 06-03p, 2006 WL 2329939, *2.[10]

A physical therapist is not an "acceptable medical source" as defined under the applicable Social Security rules and regulations but instead falls under the category of "other source." *Compare* former 20 C.F.R. § 404.1513(a) (listing "acceptable medical sources") *with* former 20 C.F.R. § 404.1513(d)(1) (medical sources not listed in § 1513(a), such as physicians' assistants, chiropractors, and therapists, are considered to be "other sources" rather than "acceptable medical sources"). *See also Nierzwick v. Comm'r of Soc. Sec.,* 7 F. App'x 358, 363

---

[9] Former § 404.1513 was in effect until March 27, 2017, and therefore applies to plaintiff's claim filed in 2013. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

[10] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

(6th Cir. 2001) (physical therapist's report not afforded significant weight because therapist not recognized as an acceptable medical source). Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2; former 20 C.F.R. § 404.1513(d).

### ii. Weight given the opinion evidence

Dr. Ward issued two medical opinions. She opined in September 2010 that plaintiff was "improving very slowly, but symptoms continue to be disabling and prevent patient from working." (Tr. 1543). Dr. Ward completed a "Peripheral Neuropathy Medical Source Statement/Arthritis Medical Source Statement" in November 2015. (Tr. 962-65, 968-71). She indicated in November 2015 that she had seen plaintiff three to four times yearly over five years. (Tr. 962, 968). Plaintiff's diagnoses were small fiber neuropathy, central pain syndrome, and lumbar/cervical degenerative disc disease with radiculopathy. (Tr. 962). Dr. Ward opined plaintiff's prognosis was poor. (*Id*.). Two diagnoses were listed on the arthritis questionnaire by code ("M46.92" and "M47.816"), and plaintiff's prognosis was described as "guarded." (Tr. 968). Plaintiff's neuropathy symptoms were pain, paresthesia, abnormal gait, deficiencies in joint proprioception, urinary incontinence, diarrhea, weakness, sensory loss, decreased deep tendon reflexes, chronic fatigue, cramping, burning calves and feet, and muscle atrophy. (Tr. 962). The pain/paresthesia was severe, constant, and located in plaintiff's arms, lower legs, feet, hands and face. (*Id*.). The symptoms noted on the arthritis form were cervical and lumbar pain, restricted range of motion, fatigue, and severe muscle spasms. (Tr. 968). The

20

pain was constant, with an average severity level of 7/10, located in the cervical and lumbar spines, and precipitated by bad weather, bending, standing, walking and stress. (*Id.*). Objective signs were reduced range of motion of the cervical and lumbar spines at the SI (sacroiliac) joint, SI joint instability, myofascial trigger points, fibromyalgia tender points, sensory changes, reflex changes, impaired sleep, weight loss, abnormal posture, tenderness, crepitus of the neck, reduced grip strength, swelling of the neck and back, muscle spasm, weakness and atrophy, abnormal gait, and positive straight leg raising test. (*Id.*). Dr. Ward opined that plaintiff had psychological problems and limitations associated with her physical impairments, which were cognitive limitations, impaired attention and concentration, impaired short-term memory, reduced ability to attend to and persist in tasks, depression, social withdrawal and anxiety. (Tr. 963). Dr. Ward indicated on the arthritis statement that depression and anxiety contribute to the severity of plaintiff's symptoms and functional limitations. (Tr. 968-69). She reported that plaintiff suffered from medication side effects including chronic fatigue, drowsiness, dizziness, memory and concentration issues, blurred vision, depression, memory loss, nausea, diarrhea, constipation, and GERD (gastroesophageal reflux disease). (Tr. 963, 969).

Dr. Ward assessed the following functional limitations: Plaintiff can walk 1 to 4 city blocks without rest or severe pain, sit 15 to 20 minutes at one time before she must get up, stand 15 to 20 minutes before she must change positions, and sit and stand/walk less than 2 hours total each in an 8-hour workday; she must be able to shift positions at will from sitting, standing or walking, to walk every 20 minutes for 10 minutes, and to take hourly unscheduled breaks during

a workday and lie down or sit quietly to rest for 10 minutes before returning to work; and she could rarely lift 10 pounds, never twist or climb ladders, and rarely stoop, crouch/squat, or climb stairs. (Tr. 963-64, 969-70). Dr. Ward indicated that plaintiff's abilities to grasp, turn and twist objects, perform fine finger manipulations, and reach in front of her body and overhead were restricted and that she had limitations on use of the upper extremities due to pain/paresthesia, muscle weakness, limitation of motion, motor loss, swelling, sensory loss/numbness, and medication side effects. (Tr. 964, 971). She opined that plaintiff was likely to be off task at least 25% of the day due to her symptoms interfering with her attention and concentration, and she was incapable of even "low stress" work. (Tr. 965, 971). Dr. Ward also reported that temperature extremes exacerbate plaintiff's neuropathy and joint symptoms. (Tr. 971). Dr. Ward dated plaintiff's symptoms and limitations back to July 2009. (Tr. 965, 971).

Dr. Valentin completed a medical source statement in November 2018. (Tr. 974-80). He reported he had seen plaintiff approximately every 6 months over a 4 to 5 year-period. (Tr. 974). He diagnosed general pain syndrome, cervical/lumbar radiculopathy, and degenerative disc disease. (*Id.*). He opined that plaintiff's prognosis was poor. (*Id.*). He reported that plaintiff had chronic pain/paresthesia in the neck, back, arms and legs that was constant and was aggravated by stress, temperature changes, light touch and movement. (*Id.*). He identified her symptoms as tenderness, crepitus, muscle spasm and weakness, chronic fatigue, weight change, sensory loss, impaired sleep, swelling, atrophy and reduced grip strength. (*Id.*). Dr. Valentin reported that plaintiff had reduced cervical range of motion. (*Id.*). He also reported that

plaintiff had severe and constant headache pain that was associated with impairment of the cervical spine; the pain level was 7/10; the symptoms associated with the headaches were nausea/vomiting, photosensitivity, impaired sleep, and exhaustion; and lying down, taking medication, being in a quiet place, massage, acupuncture, and physical therapy improved plaintiff's headache pain. (Tr. 975). He reported that objective signs of lumbar impairment were reduced range of motion, positive supine and seated straight leg raising test, muscle spasm and weakness, tenderness and impaired sleep. (Tr. 975-76). Side effects from her treatments included fatigue, decreased memory, poor concentration, and reflux. (Tr. 976). Dr. Valentin opined that depression and anxiety contributed to the severity of plaintiff's symptoms and functional limitations. (*Id.*). He assessed plaintiff as able to walk 1 to 3 city blocks without rest or severe pain; sit 15 minutes at one time before she must get up; stand 15 minutes before she must change position; and sit and stand/walk less than 2 hours each in an 8-hour workday. (*Id.*). She would need to be able to shift positions at will from sitting, standing or walking; to walk every 15 minutes for 5 to 10 minutes; and to take unscheduled breaks about every 30 minutes during a workday and lie down for 15 minutes before returning to work. (Tr. 977). She could occasionally lift 10 pounds, look down only rarely, turn her head right or left occasionally, and hold her head in a static position frequently. (*Id.*). She could occasionally twist, rarely stoop and crouch/squat, and never climb ladders/stairs. (*Id.*). Dr. Valentin opined that plaintiff was likely to be off task 25% or more of the workday due to her symptoms interfering with her attention and concentration. (Tr. 978). He opined that plaintiff was capable of only "low stress" work because stress increases her pain. (*Id.*). He further opined

23

that plaintiff's impairments were likely to produce good days and bad days and she was likely to be absent from work more than four days per month. (*Id.*). Dr. Valentin reported that temperature extremes and stress exacerbate plaintiff's neuropathy and joint symptoms. (*Id.*). Dr. Valentin also included the following additional comments:

> Confirmed diagnosis of Central Pain Syndrome (CPS). . . . The patient's symptoms are consistent with the diagnosis[.]
>
> I have known this patient for several years and [have] seen her work extremely hard to get well[.]
>
> The chronic and intractable pain and CPS symptoms resulting from the chiropractic maladjustment and spinal cord injury have led to serious and sustained depression[.]
>
> Symptoms are variable and unpredictable and can range anywhere from 5-10 on the pain scale and last anywhere from 15 minutes to several hours on any given day[.]
>
> Stress causes a major spike in the debilitating pain the patient experiences constantly[.]

(Tr. 980). Dr. Valentin dated plaintiff's symptoms and limitations back to July 2009. (Tr. 979).

Ms. Thomas, plaintiff's physical therapist, also completed an assessment in November 2015. (Tr. 982-88). Ms. Thomas reported she generally had seen plaintiff every 2 to 3 weeks since April 2013. (Tr. 982). Ms. Thomas reported that plaintiff had chronic pain/paresthesia described as nerve and muscular pain throughout the neck, thoracic and lumbar spines and into the right upper extremity, head and right lower extremity. (*Id.*). She reported the pain was constant but would increase with sitting or standing too long, temperature or barometric pressure changes, or insidiously. (*Id.*). Ms. Thomas reported symptoms of tenderness, crepitus, muscle

spasm and weakness, chronic fatigue, sensory loss, impaired sleep, abnormal posture, atrophy and reduced grip strength. (*Id.*). Cervical range of motion was limited. (*Id.*). Ms. Thomas reported that plaintiff had constant headache pain associated with impairment of the cervical spine ranging from mild to severe at the occipital, temporal and frontal regions. (Tr. 983). Ms. Thomas also reported that plaintiff had reduced lumbar range of motion, positive supine and seated straight leg raising test, abnormal gait, sensory loss, tenderness, crepitus, impaired sleep, S1 joint dysfunction, lumbar malalignment, and muscle spasm, atrophy and weakness. (Tr. 983-84). Ms. Thomas reported that plaintiff improved with treatment but the results were temporary. (Tr. 984). She reported that at times plaintiff needed to take extra medication for break-through pain, which caused her to become more drowsy and lethargic, and plaintiff often complained of gastrointestinal complaints and drowsiness. (*Id.*). Ms. Thomas assessed functional limitations that were nearly identical to those assessed by Dr. Valentin. (Tr. 984-86). She reported that factors which increase plaintiff's symptoms are any change from a normal equilibrium, including a temperature change, stress, new demands, and humidity. (Tr. 986). Ms. Thomas concluded by reporting that plaintiff's "[g]reatest injury" occurred on July 3, 2009, but she did not begin seeing plaintiff until April 2013. (Tr. 987).

### iii. The ALJ improperly weighed the treating physicians' opinions

The ALJ gave "little weight" to the opinions of Drs. Ward and Valentin. (Tr. 45). The ALJ acknowledged that Dr. Ward issued two opinions. The ALJ gave "little weight" to Dr. Ward's September 2010 opinion that symptoms of plaintiff's myelopathy and degenerative disc

25

disease "continued to be disabling and prevented her from working." (*Id.*, citing Tr. 1543).
The ALJ found that in her November 2015 assessments, Dr. Ward estimated that plaintiff had the
RFC for less than sedentary work, she would be incapable of even "low stress" work, and she
would be off task more than 25% of the work day. (*Id.*, citing Tr. 961-972). The ALJ gave
this assessment "little weight" on two grounds: (1) Dr. Ward issued the opinion three years after
she had seen plaintiff, and (2) "none of her opinions are consistent with the remainder of the
evidence in [sic] file." (Tr. 45). The ALJ also gave "little weight" to Dr. Valentin's 2015
opinion on two grounds: (1) while Dr. Valentin treated plaintiff every six months over five years,
he completed the form two years after "the relevant period"; and (2) Dr. Valentin's opinion that
plaintiff "could perform only a less than sedentary residual functional capacity and would be
absent more than four days per month due to impairments or treatment [] is inconsistent with
imaging results and the medical evidence of record [Tr. 974-80]." (*Id.*).

The ALJ did not properly evaluate the treating physicians' 2015 opinions for
"controlling" weight. "The requirement to give controlling weight to a treating source is
presumptive; if the ALJ decides not to do so, [s]he must provide evidentiary support for such a
finding." *Patterson v. Comm'r of Soc. Sec.*, No. 3:16-cv-2345, 2018 WL 502669, at *9 (N.D.
Ohio Jan. 19, 2018) (citing *Wilson*, 378 F.3d at 546; *Gayheart,* 710 F.3d at 376-77). The ALJ
did not provide evidentiary support for her findings that Dr. Ward and Dr. Valentin's opinions
are inconsistent with the other medical evidence in the file. *See* 20 C.F.R. § 404.1527(c)(2);
*Gayheart*, 710 F.3d at 376. Thus, it is impossible to discern from the ALJ's written decision
what specific evidence she found to be inconsistent with the treating physicians' opinions.

Further, the ALJ did not evaluate whether the treating physicians' opinions were supported by medically acceptable clinical findings and laboratory diagnostic techniques. *Id*. The ALJ therefore did not complete the first step of the treating physician analysis.

Further, because the ALJ did not give the treating physicians' medical opinions "controlling" weight, she was bound to evaluate their opinions in accordance with the regulatory factors provided in 20 C.F.R. § 404.1527(c) and to give "good reasons" for the weight she afforded the opinions. *Wilson*, 378 F.3d at 544; *see also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)) (quoting SSR 96-2p, 1996 WL 374188, at *4). A brief explanation of the reasons for discounting a treating physician's opinion "may satisfy the good reasons requirement, if that brief analysis touches on the required factors." *Patterson,* 2018 WL 502669, at *9 (citing *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009)). But a conclusory statement by the ALJ that the treating physician's opinion "is inconsistent with the record is insufficient to satisfy the rule." *Id*. (citing *Friend*, 375 F. App'x at 551). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 551. Here, the ALJ failed to provide sufficiently specific "good reasons" for rejecting the treating physicians' assessments.

First, although the ALJ seemingly addressed the "consistency" factor in her written decision, she did not explain why the treating physicians' restrictions were inconsistent with the

27

record.  The ALJ made only conclusory statements that the treating physicians' opinions were inconsistent with the other evidence in the record, and those generalized statements are "insufficient to satisfy the [good reasons] rule." *Patterson*, 2018 WL 502669, at *9 (citing *Friend*, 375 F. App'x at 551).  The ALJ did not identify the specific discrepancies in the record and explain why the treating opinions "got the short end of the stick.'" *Id.* (quoting *Friend*, 375 F. App'x at 552).  Nor does the ALJ's finding on the consistency factor appear to be substantially supported in light of the similarities between Dr. Ward and Dr. Valentin's assessments, and the consistency between their assessments and the functional assessment completed by plaintiff's physical therapist, Ms. Thomas.  Although the ALJ was not bound to credit Ms. Thomas's opinion, it is not clear why the ALJ rejected both the treating physicians' assessments and that of the physical therapist as inconsistent with the other substantial evidence in the record given that the assessments of all three sources appear to be substantially similar in most material respects.

The only other factors the ALJ referenced in weighing the treating physicians' opinions were the length of time plaintiff treated with Dr. Valentin and the frequency of his examinations. (Tr. 45).  However, the ALJ did not indicate what, if any, significance she placed on these factors.  It appears that the ALJ disregarded the significance of plaintiff's extended and regular treatment relationship with Dr. Valentin because Dr. Valentin did not complete his assessment for the relevant time period until two years after the date last insured.  The ALJ did not explain why the timing of the assessment detracted from its presumptive weight.  Nor did the ALJ consider the other regulatory factors to be evaluated under 20 C.F.R. § 404.1527, including the

nature and extent of the treatment relationship, supportability of the opinion, and Dr. Valentin's area of specialization. *Gayheart,* 710 F.3d 376; *see also Blakley,* 581 F.3d at 408.

The ALJ's evaluation of Dr. Ward's November 2015 opinion is likewise deficient. When evaluating Dr. Ward's opinion, the ALJ relied only on (1) a lack of consistency with the remainder of the evidence in the file, and (2) a finding that Dr. Ward issued her 2015 opinion three years after she saw plaintiff. (Tr. 45). The latter finding is factually inaccurate. The record shows that Dr. Ward had seen plaintiff as recently as March 2014. (Tr. 885-96). Further, the ALJ made only a conclusory finding that Dr. Ward's opinion is not consistent with the remainder of the record without providing an explanation and citing to any records. *Friend*; 375 F. App'x at 551; *Patterson,* 2018 WL 502669, at *9 (citing *Allen,* 561 F.3d at 651). Moreover, the ALJ did not touch on any of the additional regulatory factors. The ALJ failed to consider the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, and the supportability of the opinion. *Wilson*, 378 F.3d at 544; *Blakley*, 581 F.3d at 408.

The ALJ's failure to follow the procedural requirement of "identifying the reasons for discounting [Dr. Ward and Dr. Valentin's] opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence. . . ." *Friend*, 375 F. App'x at 551. Plaintiff's second assignment of error should be sustained.[11]

---

[11] Plaintiff also argues that the ALJ erred by failing to apply "the 'more rigorous' standard of review to the State Agency reviewing family doctor at reconsideration," and by assessing more restrictions than the state agency reviewing physician found on reconsideration even though the ALJ gave the assessment "great weight." (Doc. 6 at 8, 9). The Court will not address these arguments. Plaintiff has not developed the arguments, and it is not necessary to consider the arguments to conclude that the weight the ALJ gave the treating physicians' opinions is not substantially supported.

### 3. The ALJ's credibility evaluation and hypothetical to the VE

Plaintiff's third and fourth assignments of error allege that the ALJ improperly analyzed plaintiff's credibility and posed an unsupported hypothetical to the VE. Resolution of these issues may be impacted by the ALJ's reevaluation of the medical opinion evidence on remand. Accordingly, it is not necessary to address plaintiff's third and fourth assignments of error at this time.

### III. This matter should be reversed and remanded for further proceedings

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan,* 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). Remand for payment of benefits is warranted only "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id.*

This matter should be reversed and remanded pursuant to sentence four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits. *See Faucher,* 17 F.3d at 176. This matter should be

remanded for a reevaluation of the evidence to determine whether fibromyalgia and chronic pain syndrome are severe impairments and whether such impairments impose additional limitations on plaintiff's functioning; reweighing of the medical evidence; reassessment of plaintiff's credibility; and eliciting of additional medical and vocational evidence as warranted.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Date: _1/28/19_

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MAUREEN LOUISE RIOPELLE,
    Plaintiff,

vs.


COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-009

Black, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report

objected to and shall be accompanied by a memorandum of law in support of the objections. If

the Report and Recommendation is based in whole or in part upon matters occurring on the

record at an oral hearing, the objecting party shall promptly arrange for the transcription of the

record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems

sufficient, unless the assigned District Judge otherwise directs. A party may respond to another

party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make

objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,*

474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).